## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| SHANNON ROWE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> XENITH BANKSHARES, INC., JAMES F. BURR, PATRICK E. CORBIN, HENRY P. CUSTIS JR., PALMER P. GARSON, ROBERT B. GOLDSTEIN, EDWARD GREBOW, T. GAYLON LAYFIELD III, WILLIAM A. PAULETTE, W. LEWIS WITT, ROBERT J. MERRICK, SCOTT A. REED, and THOMAS G. SNEAD JR., <br><br> Defendants. | Case No.  3:17cv629 <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Shannon Rowe ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Xenith Bankshares, Inc. ("Xenith" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Xenith, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between Xenith and Union Bankshares Corporation ("Union").

2.     On May 19, 2017, the Board caused the Company to enter into an agreement and

plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive 0.9354 of a share of Union common stock for each share of Xenith common stock they own (the "Merger Consideration").

3.      On September 15, 2017, the Board authorized the filing of a materially incomplete and misleading joint Definitive Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for both companies; and (ii) the valuation analyses performed by the companies' financial advisors, Keefe, Bruyette & Woods, Inc. ("KBW") and Sandler O'Neill & Partners, L.P. ("Sandler O'Neill" and together with KBW the "Financial Advisors"), in support of their fairness opinions.

6.      The special meeting of Xenith shareholders to vote on the Proposed Merger is scheduled for October 26, 2017. It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Regulation G. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the

material information discussed below is disclosed to Xenith shareholders, or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant, either, because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Xenith maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a Xenith shareholder.

12.     Defendant Xenith is a Virginia corporation and maintains its headquarters at One James Center, 901 East Cary Street, Suite 1700, Richmond, Virginia 23219. Xenith, a bank

holding company, owns all of the stock of its subsidiary bank, Xenith Bank. Xenith Bank is a commercial bank chartered under the laws of the Commonwealth Virginia and offers a wide range of banking products and services to individuals and businesses primarily located in Virginia, Maryland, North Carolina, and the greater Washington, D.C. area, through 40 full service branches and two loan production offices. Xenith's common stock trades on the NASDAQ under the ticker symbol "XBKS."

13.     Individual Defendant Patrick E. Corbin is a director of Xenith and is the Chairman of the Board.

14.     Individual Defendant T. Gaylon Layfield III is a director of Xenith and is the Chief Executive Officer of the Company.

15.     Individual Defendant Thomas G. Snead is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant Palmer P. Garson is, and has been at all relevant times, a director of the Company.

17.     Individual Defendant Robert J. Merrick is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant Scott A. Reed is, and has been at all relevant times, a director of the Company.

19.     Individual Defendant W. Lewis Witt is, and has been at all relevant times, a director of the Company.

20.     Individual Defendant William A. Paulette is, and has been at all relevant times, a director of the Company.

21.     Individual Defendant Henry P. Custis, Jr. is, and has been at all relevant times, a director of the Company.

22.     Individual Defendant James Burr is, and has been at all relevant times, a director of the Company.

23.     Individual Defendant Edward Grebow is, and has been at all relevant times, a director of the Company.

24.     Individual Defendant Robert B. Goldstein is, and has been at all relevant times, a director of the Company.

25.     The parties identified in paragraph 12 through 24 are collectively referred to as Defendants.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Xenith (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

27.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of September 11, 2017, there were approximately 23,206,738 shares of Xenith common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Xenith will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

I.     **Background and the Proposed Transaction**

28.     Xenith, formerly Hampton Roads Bankshares, Inc., is a bank holding company for Xenith Bank. Xenith Bank is a commercial bank specifically targeting the banking needs of middle market and small businesses, local real estate developers and investors, and retail banking clients. Xenith Bank's regional area of operations spans from Baltimore, Maryland, to Raleigh and eastern North Carolina, complementing its presence in greater Washington, D.C., greater Richmond, Virginia, and greater Hampton Roads, Virginia. Its service and products consist primarily of taking deposits from, and making loans to, its target customers within its target markets. It offers other banking related specialized products and services to its customers, such as travelers' checks, coin counters, wire services, online banking and safe deposit box services. Additionally, it offers commercial customers various cash management products, including remote deposit.

29.     Union is a financial holding company and bank holding company. The Company operates through two segments: a community bank segment and mortgage loan origination business segment. The Company offers financial services through its community bank subsidiary, Union Bank & Trust (the Bank) and three non-bank financial services affiliates. The Company's non-bank financial services affiliates include Union Mortgage Group, Inc. (UMG), Union Insurance Group, LLC and Old Dominion Capital Management, Inc. The community bank

segment included one subsidiary bank, which provided loan, deposit, investment, and trust services to retail and commercial customers throughout its 114 retail locations in Virginia, as of December 31, 2016. The mortgage segment includes UMG, which provides a range of mortgage loan products principally in Virginia, North Carolina, Maryland, and the Washington D.C. metro area.

30.     On May 22, 2017, Xenith issued a press release announcing the Proposed Transaction. The press release stated in relevant part:

RICHMOND, Va., (GLOBE NEWSWIRE) -- Union Bankshares Corporation (NASDAQ:UBSH) or ("Union") and Xenith Bankshares, Inc. (NASDAQ:XBKS) or ("Xenith") jointly announced today that they have entered into a definitive merger agreement for Union to acquire Xenith in an all-stock transaction. Combining the two organizations will create the preeminent community banking franchise in Virginia and expand Union's retail footprint into North Carolina and Maryland.

Based on financial data as of March 31, 2017, the combined company would have total assets of $11.9 billion, total deposits of $9.2 billion and gross loans of $8.9 billion. This transaction strengthens Union's presence in Virginia's second most populous market, Hampton Roads / Virginia Beach, and adds to its Richmond and Northern Virginia footprints. After systems integration, on a pro forma basis, Union will have the fourth largest branch network in Virginia and will remain the only community bank with a statewide footprint across the Commonwealth.

"We are excited about the opportunity to bring our companies together to enhance our product and customer service capabilities," said Raymond D. Smoot, Jr., Chairman of Union Bankshares Corporation's Board of Directors. "We believe that our two companies are stronger together and the combination gives Union a unique franchise to create long term shareholder value."

"We expect that our combined statewide footprint will bring additional convenience to our customers and position us as a strong competitor against large regional institutions and smaller community banks alike – making us the preeminent community bank in Virginia," said John C. Asbury, President and Chief Executive Officer of Union. "The combination with Xenith delivers on our stated priorities for this year as well as our acquisition goals enabling Union to efficiently cross the $10 billion asset threshold. Xenith brings extensive commercial and industrial lending expertise as they were built as a C&I platform focusing on Richmond and Northern Virginia and subsequently added an extensive branch network

through the combination with the Bank of Hampton Roads. Deepening our presence in Hampton Roads and adding to our Richmond and Northern Virginia network were priorities for Union and we're also able to gain retail entry points in North Carolina and Maryland.  With a more diverse loan portfolio, lower loan to deposit ratio and efficiencies gained, I believe the combined franchise will be able to generate sustainable top-tier financial performance for our shareholders."

"This transaction delivers on Xenith's original vision to be an integral part of creating the preeminent commercial bank headquartered in the Commonwealth of Virginia," said T. Gaylon Layfield, III, Chief Executive Officer for Xenith. "With a statewide presence, strong pro forma capital ratios, enhanced retail delivery system and focused commercial banking capabilities, the combined company will be positioned to deliver value to our customers.  Both banks are committed to attracting the best talent available and building a culture that encourages and enables that talent to better serve our customers and to be effective in setting the combined company apart from the competition.  I look forward to working with our new teammates to deliver on this exciting vision."

Following the closing of the merger Asbury will continue as President and CEO of the combined organization, and Layfield will serve for a transitional period as Executive Vice Chairman of Union Bank & Trust working to ensure a successful integration and enhancing the commercial banking strategy.  Following the closing of the merger, the Union Board of Directors will expand to 20 members, and will be composed of 18 members from the current Union Board and two members from the Xenith Board.  Smoot will continue to serve as Chairman of the Board of combined company.

Under the terms of the merger agreement, each outstanding share of Xenith common stock will be converted into the right to receive 0.9354 shares of Union common stock.  This implies a deal value per share of $29.67 per share of Xenith common stock or approximately $701.2 million in the aggregate based on Union's closing stock price of $31.72 on May 19, 2017.  Shareholders owning more than 4.9% of Xenith common stock will, after the closing of the merger, be subject to a restriction on the sale of their Union shares for 60 days.

In consideration of the merger, extensive due diligence was performed by both companies over a six-week period.  The merger agreement has been approved by the board of directors of each company.  The companies expect to complete the transaction in early January 2018, subject to the satisfaction of customary closing conditions, including regulatory and shareholder approvals.

II.     **The Merger Consideration Fails to Fairly Compensate Xenith Shareholders.**

31.     The Merger Consideration is severely inadequate given Xenith's recent financial performance and strong growth prospects. On May 19, 2017, Union's stock price was trading at 31.72. Based on the 0.9354 exchange ratio, this placed the value of the Merger Consideration at $29.67. The agreed upon Merger Consideration represents a marginal premium to Xenith's current trading price and a 1.5% *discount* to Xenith's 52-week high trading price of $30.13.

32.     In the year leading up to the announcement of the Proposed Merger Xenith's stock price increased over 50%, going from $17.50 on May 19, 2016 to $26.87 on May 19, 2017, illustrated by the chart below:



33.     Indeed, on May 4, 2017, the Company announced positive financial results for the 2017 first quarter. The Company exceeded both earnings and revenue projections. First quarter net income was up 200% year-over-year and over 9% from fourth quarter 2016. CEO T. Gaylon

Layfield, III announced:

> As we continue our merger integration, we are seeing a number of positive trends. They include net interest margin expansion helped by holding the line on deposit costs, a slightly more asset-sensitive balance sheet, continued progress on measures of asset quality, and our ability to attract high quality bankers in selected markets. More than $1 million in non-recurring expenses plus merger-related expenses in the first quarter did impact our efficiency ratio, but with our considerable focus across the bank on driving efficiencies, I believe overall improvement will continue. As has been the case historically, the first quarter of the year did not result in the kind of loan growth that we have typically generated over the course of the year.  On the plus side, most of the loan reduction we experienced in the first quarter was in low-margin and non-core loans. Our pipeline looks sound, especially in the Richmond and Greater Washington markets.  Our loan-to-deposit ratio has improved to 90% reflecting non-core loan contraction and good core deposit growth. Key balance sheet metrics around capital and liquidity and low reliance on wholesale funding provide a solid platform for core loan growth and help reduce the pressure to raise deposit rates as market interest rates continue their upward march.

34.     Xenith's good news continued for 2017 Secord Quarter financial results. Net Income increased even further both year-over-year and from the previous quarter. Layfield stated on July 26, 2017:

> The last 18 months have been a time of great change for Xenith. Significant progress has been made on many fronts since combining the operations of the company and legacy Xenith Bankshares. Net interest margin expansion, improved credit quality, and a reduction of operating costs have improved our overall performance sharply, which is reflected in our results. Solid core deposit growth combined with holding overall deposit costs steady has been an area of focus and I am pleased with the results. Core net loan growth has not met expectations this quarter or for the first half of the year, despite nearly $300 million of new loans outstanding year-to-date. I attribute this to a number of factors, including:  some large loan pay-offs; an especially close focus on our existing client base during our system conversion in November 2016 at the expense of new business generation by our relationship managers; and the general industry pattern of softening loan demand. Despite these challenges, our core loan portfolio is about even with 2016 year-end and our backlog looks solid in both commercial real estate (CRE) and commercial and industrial (C&I) loan sectors. Our marine lending business continues to grow nicely. Through our system conversion, we retained virtually all of our client base and our focus has shifted back to the traditional mix of servicing existing relationships and developing new

ones. As a result, I expect net loan growth to pick up in the second half of 2017.

35.     Finally, KBW valued the Company at a higher price than the Merger Consideration. KBW calculated an implied equity value per share of up to $45.30, substantially higher than the value of Union, up to $36.41 per share. Given that the exchange ratio provides Xenith shareholders with less than a share of Union, the Merger Consideration is severely inadequate.

36.     In sum, the Merger Consideration appears to inadequately compensate Xenith shareholders for their shares.  Given the Company's strong financial results and growth potential, it appears that the exchange ratio is not fair compensation for Xenith shareholders. It is therefore imperative that the Company's shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and make an informed decision concerning whether to vote in favor of the Proposed Merger.

## III.    The Merger Agreement's Deal Protection Provisions Deter Superior Offers.

37.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Xenith.

38.     First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Xenith shareholders. The Merger Agreement states that the Company and the Individual Defendants shall not:

> (i) initiate, solicit, endorse, or knowingly encourage or knowingly facilitate any inquiries, proposals or offers with respect to or any inquiry, proposal or offer that is reasonably likely to lead to an acquisition proposal; or (ii) engage or participate in any negotiations or discussions concerning, or provide any confidential or nonpublic information relating to, an acquisition

proposal.

39.     Additionally, the Merger Agreement grants Union recurring and unlimited matching rights, which provides Union with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) five business days to negotiate with Xenith, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.

40.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Union can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Union, to the detriment of Xenith's public shareholders.

41.     Lastly, the Merger Agreement provides that Xenith must pay Union a termination fee of $26,500,000 in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Xenith shareholders with a superior offer.

42.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

43.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Xenith's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

IV.     **The Proxy Is Materially Incomplete and Misleading.**

44.     On September 15, 2017 Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger. The Individual Defendants were obligated to carefully review the Proxy to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information, in violation of Sections 14(a) and 20(a) of the Exchange Act, that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger.

45.     First, the Proxy completely omits any of the income-based projections that the Xenith or Union managements prepared. The inclusion of income-based projections is necessary, so that shareholders can judge for themselves the reasonableness of managements determinations. The Proxy includes EPS and tangible book value per share at the end of period, but fails to include any income based or deposit projections. Therefore, the omission of these projections renders then Proxy materially incomplete and misleading.

46.     The omission of above-referenced projections renders the financial projections included on page 82 of the Proxy materially incomplete and misleading.  If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

47.     Further, the Proxy fails to provide material information concerning the Company's included financial projections. Specifically, the Proxy provides projections for non-GAAP (generally accepted accounting principles) metrics, including EPS and tangible book value per share, but fails to provide line item projections for the metrics used to calculate these non-GAAP

measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

48.     When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

49.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Xenith has included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures

and disclosures.[1]

50.     The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[2] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[3] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

51.     In order to make the projections included on page 83 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

52.     At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, EPS and tangible book value per share.  Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading.

---

[1]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[2]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[3]     *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

53.     Xenith regularly performs non-GAAP reconciliations in their earnings press releases made to shareholders. In fact, the Company provides thorough non-GAAP reconciliation to the historical financial measures used in this Proxy:

**Non-GAAP Measures:**

| | Six Months Ended June 30, (unaudited) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2017 | 2016 | 2016 | 2015 | 2014 | 2013 | 2012 |
| | *(Dollars in thousands, expect per share information)* | | | | | | |
| **Net Interest Income (FTE)** | | | | | | | |
| Net interest income (GAAP) | $ 135,567 | $ 129,507 | $ 265,150 | $ 251,834 | $ 255,018 | $ 151,626 | $ 154,355 |
| FTE adjustment | 5,188 | 4,941 | 10,244 | 9,079 | 8,127 | 5,256 | 4,222 |
| Net interest income (FTE) (non-GAAP) | $ 140,755 | $ 134,448 | $ 275,394 | $ 260,913 | $ 263,145 | $ 156,882 | $ 158,577 |
| Average earning assets | $7,798,427 | $7,061,307 | $7,249,090 | $6,713,239 | $6,437,681 | $3,716,849 | $3,649,865 |
| Net interest margin (GAAP) | 3.51% | 3.69% | 3.66% | 3.75% | 3.96% | 4.08% | 4.23% |
| Net interest margin (FTE) (non-GAAP) | 3.64% | 3.83% | 3.80% | 3.89% | 4.09% | 4.22% | 4.34% |
| Efficiency ratio (GAAP) | 68.03% | 67.02% | 66.27% | 68.45% | 75.31% | 72.00% | 68.26% |
| Efficiency ratio (FTE) (non-GAAP) | 66.04% | 65.06% | 64.31% | 66.54% | 73.43% | 70.06% | 66.81% |
| **Tangible Assets** | | | | | | | |
| Ending assets (GAAP) | $8,915,187 | $8,100,561 | $8,426,793 | $7,693,291 | $7,358,643 | $4,176,353 | $4,095,692 |
| Less: Ending intangible assets | 315,613 | 321,108 | 318,793 | 316,832 | 325,277 | 71,380 | 75,211 |
| Ending tangible assets (non-GAAP) | $8,599,574 | $7,779,453 | $8,108,000 | $7,376,459 | $7,033,366 | $4,104,973 | $4,020,481 |
| **Tangible Common Equity** | | | | | | | |
| Ending common stockholders' equity (GAAP) | $1,030,869 | $ 989,201 | $1,001,032 | $ 995,367 | $ 977,169 | $ 437,810 | $ 435,564 |
| Less: Ending intangible assets | 315,613 | 321,108 | 318,793 | 316,832 | 325,277 | 71,380 | 75,211 |
| Ending tangible common stockholders' equity (non-GAAP) | $ 715,256 | $ 668,093 | $ 682,239 | $ 678,535 | $ 651,892 | $ 366,430 | $ 360,353 |
| Average common stockholders' equity (GAAP) | $1,018,277 | $ 988,281 | $ 994,785 | $ 991,977 | $ 983,727 | $ 435,635 | $ 435,475 |
| Less: Average intangible assets | 317,139 | 316,248 | 318,131 | 320,906 | 333,495 | 73,205 | 77,790 |
| Average tangible common stockholders' equity (non-GAAP) | $ 701,138 | $ 672,033 | $ 676,654 | $ 671,071 | $ 650,232 | $ 362,430 | $ 357,685 |
| Return on average common stockholders' equity (GAAP) | 7.34% | 7.39% | 7.79% | 6.76% | 5.30% | 7.89% | 8.10% |
| Return on average tangible common stockholders' equity (non-GAAP) | 10.66% | 10.86% | 11.45% | 10.00% | 8.02% | 9.48% | 9.86% |
| Common equity to total assets (GAAP) | 11.56% | 12.21% | 11.88% | 12.94% | 13.28% | 10.48% | 10.63% |
| Tangible common equity/tangible assets (non-GAAP) | 8.32% | 8.59% | 8.41% | 9.20% | 9.27% | 8.93% | 8.96% |
| Book value per share (GAAP) | $ 23.79 | $ 22.87 | $ 23.15 | $ 22.38 | $ 21.73 | $ 17.63 | $ 17.29 |
| Tangible book value per share (non-GAAP) | $ 16.50 | $ 15.44 | $ 15.78 | $ 15.25 | $ 14.50 | $ 14.76 | $ 14.30 |

54.     With respect to Financial KBW's Discounted Cash Flow Analysis, the Proxy fails to disclose the following key components used in their analysis: (i) the actual cash flow values used for both Xenith and Union; (ii) the long term growth rates applied to the cash flows; (iii) any

net operating loss carryforwards applied to the cash flows; (iv) the inputs and assumptions underlying the calculation of the discount rate ranges for each company; (v) the inputs and assumptions underlying the selection of the earnings multiple ranges; and (vi) the actual range of terminal values calculated and utilized in the Analysis.

55.     These key inputs are material to Xenith shareholders, and their omission renders the summary of KBW's Discounted Cash Flow Analysis on page 68-69 of the Proxy incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions – in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id*.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion *unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices*. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id*. at 1577-78.

56.     With respect to Sandler O'Neill's *Net Present Value Analyses*, the Proxy also fails to disclose the following key components used in the analysis: (i) the inputs and assumptions

underlying the selected range of earnings multiples for each company; (ii) the inputs and assumptions underlying the selection of tangible book value ranges for each company; (iii) the inputs and assumptions underlying the calculation of discount rate ranges for each company; (iv) the inputs and assumptions underlying the calculation of the estimated long-term EPS growth rates for each company; and (v) the actual value of the estimated long-term EPS growth rate utilized for each company. As with the Discounted Cash Flow Analyses, this valuation analysis was performed by the Company's financial advisors, heavily relied on by shareholders, and is expected to represent a clear and accurate state of the two companies' finances. Thus, in summarizing the analysis in the Proxy, the Company must be completely transparent with the information provided. The failure to include this valuable information renders the summary of the analysis set forth in the Proxy materially incomplete and misleading.

57.     With respect to the Financial Advisors' *Selected Companies* and *Selected Transactions* Analyses, the Proxy fails to disclose the individual multiples the Financial Advisors calculated for each company and transaction utilized. The omission of these multiples renders the summary of these analyses and any implied valuations materially misleading.  A fair summary of Companies and Transactions analyses requires the disclosure of the individual multiples for each company and transaction; merely providing the range that a banker applied is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

58.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a

fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act, Rule 14a-9, and 17 C.F.R. § 244.100 Promulgated Thereunder)

59.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

61.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

62.     SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading."  17

C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).  As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

63.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

64.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.   Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; and (ii) the valuation analyses performed by Financial Advisors' in support of their fairness opinions.

65.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

66.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed

Merger; indeed, the Proxy states that Sandler O'Neill reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Sandler O'Neill as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company.

67.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review Sandler O'Neill's analyses in connection with their receipt of the fairness opinion, question Sandler O'Neill as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

68.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

69.     Xenith is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

70.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the

Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

71.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

72.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

73.     The Individual Defendants acted as controlling persons of Xenith within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Xenith, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

74.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had

the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

76.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

77.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

78.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

79.     Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 19, 2017                          Respectfully submitted,

                                                   **LEVI & KORNSINSKY LLP**

**MONTEVERDE & ASSOCIATES PC**            /s/ Elizabeth K. Tripodi_____
                                          Elizabeth K. Tripodi (VA Bar No. 73483)
Juan E. Monteverde                        1101 30th Street, N.W., Suite 115
The Empire State Building                 Washington, DC 20007
350 Fifth Avenue, Suite 4405              Tel: (202) 524-4290
New York, NY 10118                        Fax: (202) 333-2121
Tel: (212) 971-1341                       Email: etripodi@zlk.com
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
                                          *Attorneys for Plaintiff*